UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

KENNETH STEAGALL,
PLAINTIFF

CASE NO. 1:07CV961
(BARRETT, J.)
(HOGAN, M.J.)

VS.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,
DEFENDANT

## REPORT AND RECOMMENDATION

Plaintiff filed his application for Disability Insurance Benefits in July, 2003. His application was denied, both initially and upon reconsideration. He then requested and obtained two hearing before an Administrative Law Judge (ALJ) in December, 2006 and April, 2007 at Cincinnati, Ohio. Plaintiff, who was represented by counsel at the hearings, testified as did Vocational Expert (VE), Dr. George Parsons. The ALJ reached an unfavorable decision in April, 2007, following which Plaintiff processed an appeal to the Appeals Council. In September, 2007, the Appeals Council denied Plaintiff's request to review, which constituted the final order of the Social Security Administration. Plaintiff timely filed his Complaint seeking judicial review in November, 2007.

## STATEMENTS OF ERROR

While the ultimate decision on review of any Social Security case is whether or not substantial evidence supports the decision of the Administration, Plaintiff's counsel has provided two sources of error which impact the ultimate decision with respect to substantial evidence. The first is that the ALJ erred by failing to give controlling weight to the opinions of treating physicians, Drs. Wunder and Murphy and by formulating a residual functional capacity

assessment which conflicted with those opinions. The second is that the ALJ erred by relying upon the VE's opinion to determine that Plaintiff's impairments did not preclude the performance of past relevant work as an electrician. We disagree that the ALJ made any error prejudicial to the fair and just determination of Plaintiff's claim.

## THE OPINION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ determined that Plaintiff has two impairments: degenerative disc disease and a shoulder impingement with underlying acromioclavicular joint arthrosis. He further found that these two impairments are severe, but met no Listing, either alone or in combination. The ALJ further found that Plaintiff could return to his past relevant work as an electrician, not as previously performed, but at the light exertional level, and was therefore not disabled.

## PLAINTIFF'S TESTIMONY AT THE HEARINGS

Plaintiff testified that he was involved in a motor vehicle accident in December, 2002 and suffered an injury to his low back, for which he had received conservative treatment by chiropractors, Drs. Thomas Shockly and Jeffrey Stambough, as well as through Drake Hospital Rehabilitation Center. Plaintiff identified Dr. Andrea Murphy as his current treating physician. He has used a TENS unit, had aquatic therapy and had back surgery in March, 2004. Functional capacity evaluations were done at Drake and at Tri-Health. Plaintiff identified Dr. Steven Wunder as someone he has seen. Plaintiff stated that his medical insurance terminated in the last quarter of 2004.

Following the disc fusion surgery, Dr. Stambough located a crack above the disc, which was not present when the surgery took place and recommended a course of steroidal injections, which Plaintiff could not afford to complete. Dr. Stambough also recommended rotator cuff surgery on both shoulders after injections failed to correct the problem. Plaintiff indicated that Dr. Murphy had treated him for diabetes.

Plaintiff said that he went to the emergency room at University Hospital for headaches

2

and feeling lightheaded in 2006 and it was there that the diabetes was diagnosed.

Plaintiff stated that his prior employment was as an electrician. (Tr. 492-504). Plaintiff stated he was born in July, 1953, is 5'9" tall and weighs 230 lbs. He is single, right-handed, a non-smoker and a licensed driver. He possesses a GED and completed a four-year apprenticeship before becoming a union electrician. He functioned as an electrician for approximately 15 years and served as a union steward for IBEW. He worked for a time at A.K. Steel, performing maintenance on electrical systems there. Plaintiff related that he had three steroidal injections to his low back before the surgery and that only the first one helped and for only three or four months. He attributed the fracture to a fall while getting into a bathtub.

Plaintiff listed a number of pain medications prescribed for him, but stated they gave him only temporary relief. His use of a cane was prescribed by Dr. Murphy after he complained of leg pain. (Tr. 508-522). Plaintiff related that he could sit for 45 minutes and stand for the same amount of time. He said Dr. Stambough put him on a 30 lb. lifting restriction. (Tr. 527-529).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The VE testified that Plaintiff had transferable skills from his training and work as an electrician, which he performed at the medium exertional level. The jobs of estimator and planner/expeditor could be performed and these jobs are in a significant number in the national economy. The first hypothetical, which the ALJ ultimately accepted, asked the VE to assume the accuracy of the assessments performed by Cindi Lynn Hill, M.D., and J. Rod Coffman, Ph.D. The VE responded that there would be a representative number of light electrician jobs in the skilled and semi-skilled areas. The second hypothetical asked the VE to assume the accuracy of the assessments done by Cindi Lynn Hill, M.D. and Richard Sexton, Ph.D. The VE responded that "[h]e can do the same or similar jobs I've already enumerated." The third hypothetical asked the VE to assume the accuracy of Plaintiff's testimony. The VE responded that "[h]e'd be unable to sustain himself in any kind of work activity." (Tr. 522-537).

3

## THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found that Plaintiff has degenerative disc disease and a shoulder impingement with underlying acromioclavicular joint arthroses, and that these two impairments are severe within the meaning of the Regulations. The ALJ found that neither, alone or in combination, meets or exceeds any Listing. The ALJ further found that Plaintiff retained the residual functional capacity as set forth in the opinions of Drs. Hill and Coffman. The ALJ found that Plaintiff could perform the duties of an electrician, not as previously performed at the skilled and medium exertional level, but as generally performed in the national economy, at the light skilled and semi-skilled level. The ALJ found Plaintiff to be not disabled and unable to share in the Social Security fund.

## THE MEDICAL RECORD

Plaintiff was involved in a motor vehicle accident in November, 2002. His vehicle was parked on the side of the road and was struck in the rear by another vehicle, which apparently slid on snow and ice. Plaintiff was wearing his seat belt at the time. X-rays taken in December , 2002 of the skull, cervical and lumbar spine showed only a "moderate neural foraminal narrowing on the right at C3-4 secondary to uncovertebral spurring." (Tr. 141-142). Plaintiff saw Dr. Shockley in January, 2003 with complaints of neck and back pain radiating down the left leg. A Medrol Dosepak was recommended, as was physical therapy. The diagnosis was "cervical strain, lumbar strain and sciatica." (Tr. 143). On a subsequent visit, also in January, 2003, Dr. Shockley ordered an MRI of the lumbar spine, prescribed Vioxx and Robaxin and imposed two work-related restrictions, no lifting of more than 15 lbs. and no repetitive bending or twisting of the back. (Tr. 145). In January, 2003, an MRI was done by William Drew, M.D. The results indicated "Left lateral disc protrusions at L3-4 and L5-S1. The protruding disc material being of high T2 signal suggesting some disruption of annular fibers. There could be impingement of the existing nerve roots within the foramina at either of these two levels." The results also showed a "[s]mall right lateral protrusion at L4-5, which does not appear to be affecting the exiting nerve

4

root." (Tr. 146-147).

Plaintiff saw Dr. Shockley in February, 2003 for complaints of low back and neck pain as well as right shoulder pain. The recommended treatment plan was for epidural injections to the low back pain and an injection to the right shoulder with a mixture of Kenalog and Lidocaine. (Tr. 148). A lumbar epidural injection was done in February, 2003 by C. Duane Bellamy, M.D. at Christ Hospital. (Tr. 149-150). Plaintiff reported doing much better after the shoulder injection, but after initial success, the back pain returned. Dr. Shockley recommended a second epidural injection for the low back and continued physical therapy. (Tr. 151). This was done in March, 2003. (Tr. 153-154). A third injection was done in May, 2003. (Tr. 157-159). The Spectrum Rehabilitation Discharge Summary indicated in April, 2003, that Dr. Shockley discharged Plaintiff from further therapy and that some of the rehabilitation goals were met. (Tr. 160-161). Nerve conduction studies done in July, 2003 showed "No evidence of radiculopathy." (Tr. 162).

Dr. Shockley referred Plaintiff to Dr. Stambough, an orthopaedic surgeon, who determined that in addition to his neck and back problems, Plaintiff suffered from" peptic ulcers and mild exogenous obesity." Orthopaedic examination showed "decreased range of motion, tenderness in the right lumbosacral region and an antalgic gait." An EMG was normal. Dr. Stambough did not feel that Plaintiff was a surgical candidate, but recommended an additional MRI and a course of aggressive physical therapy." (Tr. 162-165). The second MRI was done in August, 2003. The MRI report indicated "Overall stable MRI of the LS spine, degenerative disc disease at L3-4, L4-5 and L5-S1 with posterior annular tear in the left far lateral region at L3-4, bilateral far lateral region at L4-5, left far lateral region at L3-4, and left far lateral region of L5-S1 without spinal stenosis nor nerve root compression." (Tr. 167-169). In August, 2003, Dr. Stambough diagnosed Plaintiff with "spinal stenosis at L4-5 with more lateral recess involvement." He ordered a CT myelogram with flexion and extension views. There was no muscle weakness or sensory loss. (Tr. 170-171).

In September, 2003, Plaintiff reported knee pain to Dr. Stambough, who injected it with a mixture of Kenalog and Carbocaine. A repeat look at the MRI suggested spondolisthesis, which could account for Plaintiff's L4-5 pain. Plaintiff was cleared to return to work. (Tr. 173-174).

5

X-rays of the left knee showed Plaintiff to have "Pellegrini-Stieda disease, which is calcification of the medial collateral ligament from an old injury." There were "some degenerative changes in the knee." (Tr. 175). In September, 2003, Dr. Stambough diagnosed Plaintiff with spondololisthesis or "slipped vertebra." (Tr. 176-178). In October, 2003, Plaintiff reported a 50% improvement after aquatic therapy and chiropractic treatments by John Ruch, D.C. (Tr. 179-180). In January, 2004, Dr. Stambough scheduled Plaintiff for a lumbar fusion after epidural steroids, chiropractic manipulation, physical therapy, strengthening and functional restoration and medical management all failed. (Tr. 181-183). In March, 2004, Dr. Stambough indicated that recovery takes from 6 to 18 months and that once cleared to work, Plaintiff would be precluded from anything above a "moderate or medium" exertional level. (Tr. 185). The surgery, a posterolateral L4-5 fusion with reduction of spondololisthesis and lumbar decompression with partial laminectomy was done in March, 2004. (Tr. 382-393).

In March, 2004, Dr. Stambough reported that Plaintiff was "neurologically intact," that his "spondolisthesis is stabilized and his fusion is in good order." (Tr. 186). In April, Dr. Stambough reported to C. Keith Melvin, M.D. , Plaintiff's primary care physician, that Plaintiff had "increasing headaches, severe shoulder pain and resolving lower back pain." The shoulder was injected with a mixture of Kenalog and Lidocaine. (Tr. 187-188). An MRI of Plaintiff's right shoulder in May, 2004 showed "mild hypertrophic change at the acromioclavicular joint with impingement upon the supraspinatus tendon but without tendinitis or rotator cuff tear." (Tr. 189). Dr. Stambough interpreted the MRI results as showing AC joint arthritis with hypertrophy, subacromial impingement and bursitis, but no evidence of rotor cuff tear or disruption. (Tr. 190). In June, 2004, Dr. Stambough noticed that Plaintiff was depressed and had not yet returned to work. He was conditionally cleared for work with restrictions, no lifting above 30 lbs, sit-stand option as long as he wears a brace. (Tr. 192).

The Deaconness Hospital report following the automobile accident in December, 2002, showed that he sustained a "small contusion on the left side of the scalp." There was no loss of consciousness, nausea or vomiting and no neck pain or neurologic symptoms. He arrived fully ambulatory. (Tr. 207-208). A CT of the lumbar spine in August, 2003 showed "minimal Grade 1 spondololisthesis of L4-5 due to degenerative facet disease" and a "mild concentric disc bulge

6

at L5-S1 and L3-4 without spinal stenosis or nerve root compression. There is also mild degenerative facet disease at L5-S1." (Tr. 213- 214).

In April, 2003, Dr. Shockley reported that Plaintiff's last epidural was unsuccessful, unlike the first two, but that his "shoulders are doing much better." Vioxx, Robaxin and Ultracet was prescribed along with a TENS unit. He was cleared for light duty work, but his employer had none. (Tr. 221). In May, 2003, Dr. Shockley reported that Plaintiff's pain was self-rated as a "6" on a scale of "10." (Tr. 222).

Plaintiff started a course of structured aquatic therapy and exercise program at the Drake Center in September, 2003. The therapy was uneventful, but in December, 2003, Plaintiff stopped attending therapy sessions. The therapists recommended that therapy be resumed. (Tr. 226-263).

Dr. Stambough referred Plaintiff to John Ruch, D.C. in September, 2003 for a 4-6 week trial of chiropractic management. Dr. Ruch reported that Plaintiff had attempted to return to work, but was physically unable and was placed on temporary disability status. (Tr. 265-266). Decompression therapy was helpful at first, but Plaintiff's pain often returned and sometimes before the end of the day when the chiropractic treatment was rendered. (Tr. 266-324). Plaintiff underwent elective spine surgery, a lumbar spinal fusion and partial laminectomy, in March, 2004. (Tr. 323-324). Dr. Stambough noted that the surgery was performed after Plaintiff had "failed conservative methods, including epidural steroids, medications, extensive physical therapy and stabilization exercises." An MRI and CT myelogram confirmed the diagnosis of "unstable L4-5 degenerative type spondolisthesis." (Tr. 325-327).

A physical residual functional capacity assessment was completed by Gary Hinzman, M.D., in May, 2004. Dr. Hinzman determined that Plaintiff could lift 20 lbs. occasionally and 10 lbs. frequently, could stand/walk for 6 hours per day and sit for about 6 hours per day. Plaintiff should never climb ladders, ropes or scaffolds, but could occasionally crouch or stoop. He had a limited ability to reach overhead with his right hand. (Tr. 343-347).

A disability assessment was also made by Richard Sexton, Ph.D., a clinical psychologist. Dr. Sexton diagnosed Plaintiff with Dysthymic Disorder (managed by antidepressant medication). Dr. Sexton assigned a GAF of 55-59. Dr. Sexton opined that Plaintiff "appeared

7

capable of performing simple repetitive-type tasks, was able to understand, recall and carry out simple instructions. His ability to interact with other people would appear to be fair, as would his ability to tolerate the daily stress and pressure of a work environment." (Tr. 348-351).

Cindi Lynn Hill, M.D. completed another physical residual functional capacity assessment in October, 2004. Dr. Hill opined that Plaintiff could occasionally lift 30 lbs. and frequently lift 20 lbs. He should not repetitively lift and should not bend or twist at the waist and should wear a back brace at work. He could stand/walk for 6 hours in a workday and could sit for 6 hours in a workday, but must be allowed a sit/stand option. He should never crawl or climb ladders, ropes or scaffolds, but could occasionally climb ramps or stairs and stoop. He has a limited ability to reach overhead with his right arm. (Tr. 353-361).

A psychiatric residual functional capacity assessment, called a Psychiatric Review Technique for some reason not apparent to the writer, was completed by J. Rod Coffman, Ph.D. in August, 2004. Dr. Coffman also diagnosed Plaintiff with Dysthymic Disorder, but felt that he had no limitations of his ability to perform the activities of daily living and only a mild limitation of his ability to maintain social function and maintain concentration, persistence or pace. (Tr. 362-375).

Dr. Stambough summarized his treatment of Plaintiff in an August, 2004 letter to Plaintiff's attorney. Dr. Stambough stated that following the automobile accident in December, 2001, Plaintiff sustained a concussion, which was treated by Keith Melvin, M.D. and injuries to both shoulders. The left shoulder injury, a strain, was resolved and there is no resulting dysfunction. However, the right shoulder pain results from a "mild impingement with acromioclavicular joint arthrosis." The rotator cuff is not torn. The shoulder is painful, but there is no impairment due to loss of motion or function. He has "unstable degenerative-type spondololisthesis" in his lower back. This condition was likely aggravated by the automobile accident. Because conservative therapy was not successful over an extended period of time, Plaintiff chose to undergo a lumbar decompression and fusion at L4-5, which resulted in a loss of lumbar motion. He has a total body impairment of 20-23%. In addition, Plaintiff has become depressed as a result of pain, not working and other unknown factors. He was prescribed Elavil and Celexa. His work activity should be in the sedentary category. (Tr. 376-378).

8

Plaintiff was examined by Steven Wunder, M.D. in December, 2005 on a referral by Dr. Stambough. Dr. Wunder found that Plaintiff met the Listing for chronic radiculopathy because he "had clinical findings with sensory loss, motor loss and reflex loss" plus "underlying shoulder impingement." Dr. Wunder's opinion was that Plaintiff could not sustain remunerative employment and that his prognosis was "poor." His diagnosis was "status post lumbar fusion at L4-5 and intermittent radiculitis in the left leg." Plaintiff reported "acute exacerbation of his symptoms," which were bilateral shoulder pain, migraine headaches, decreased strength and diminished sensation over the left EHL diminished left Achilles tendon reflex, left leg radiculitis, left shoulder impingement and depression. Dr. Wunder's opinion was based on his interview, physical examination and his review of Plaintiff's x-rays, MRIs and a CT scan of the spine. (Tr. 380-381).

After surgery, Plaintiff had physical therapy from September, 2003 to November, 2004 at the Drake Center and at the Orthopaedic Diagnostic and Treatment Center. (Tr. 394-445).

Dr. Murphy reported in January, 2007 that she has been Plaintiff's primary care physician and has seen him regularly for the past 10 months. Dr. Murphy stated that following the automobile accident in 2002, and the subsequent spinal fusion surgery, Plaintiff's "injury has worsened and his general health declined." Her physical examinations showed "extremely limited range of motion in the spine in all directions." He has an "antalgic gait" and is "unable to sit or stand for an extended period of time." He has a "good attitude and a pleasant smile." "As a result of not being able to work, he has lost his medical insurance and has limited access to medical care." He "often uses a cane for assistance." He "struggles daily with pain and depression." Dr. Murphy described her patient as having "done an amazing job of controlling his diabetes." She concludes: "[o]f the multiple patients I have receiving disability assistance, Ken is the most deserving - not just because I like him, but because he is truly disabled." (Tr. 448-449).

Lastly, there is a letter from Frank Cloud, the Business Manager for IBEW, Local 648, who states that Plaintiff has been a member since 1981, that the work requires heavy physical activity, and that Plaintiff cannot perform the required work.

9

## OPINION

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal

those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

The Commissioner is required to consider plaintiff's impairments in light of the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing). The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 404.1525(a). If plaintiff suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without consideration of plaintiff's age, education, and work experience. 20 C.F.R. § 404.1520(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff's impairment need not precisely meet the criteria of the Listing in order to obtain benefits. If plaintiff's impairment or combination of impairments is medically equivalent to one in the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment. 20 C.F.R. § 404.1526(a). The decision is based solely on the medical evidence, which must be supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1526(b).

If plaintiff's alleged impairment is not listed, the Commissioner will decide medical equivalence based on the listed impairment that is most similar to the alleged impairment. 20 C.F.R. § 404.1526(a). If plaintiff has more than one impairment, and none of them meet or equal a listed impairment, the Commissioner will determine whether the combination of impairments is medically equivalent to any listed impairment. *Id.*

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case

11

by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321 (6th Cir. 1978); *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *see Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

The grid is designed for use when the alleged impairment manifests itself through limitations in meeting the strength requirements of jobs. 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). If plaintiff suffers solely from nonexertional impairments, the grid is inapplicable and the Commissioner must rely on other evidence to rebut plaintiff's prima facie case of disability. *Id.*, § 200.00(e)(1). Nonexertional impairments include "certain mental, sensory, [and] skin impairments" as well as "postural and manipulative limitations [and] environmental restrictions." 20 C.F.R. Subpart P, Appendix 2, § 200.00(e). Where a plaintiff suffers from an impairment or a combination of impairments that results in both exertional and nonexertional limitations, the grid is consulted to see if a finding of disability is directed based upon the strength limitations alone. If not, the grid is then used as a framework and the Commissioner examines whether the nonexertional limitations further diminish plaintiff's work capability and preclude any types of jobs. *Id.*, § 200.00(e)(2). If an individual suffers from a nonexertional impairment that restricts performance of a full range of work at the appropriate residual functional capacity level, the Commissioner may use the grid as a framework for a decision, but must rely on other evidence to carry his burden. *Abbott v. Sullivan*, 905 F.2d 918, 926-27 (6th Cir. 1990); *Damron v. Secretary of H.H.S.*, 778 F.2d 279, 282 (6th Cir. 1985); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528-29 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). The existence of a minor nonexertional impairment is insufficient to preclude use of the grid for

12

directing a decision. Rather, plaintiff must demonstrate that the nonexertional impairment "significantly limits" his ability to do a full range of work at the appropriate exertional level in order to preclude a grid based decision. *Atterberry v. Secretary of H.H.S.*, 871 F.2d 567, 572 (6th Cir. 1989); *Cole v. Secretary of H.H.S.*, 820 F.2d 768, 771-72 (6th Cir. 1987); *Kimbrough v. Secretary of H.H.S.*, 801 F.2d 794, 796 (6th Cir. 1986).

The assumptions contained in an ALJ's hypothetical question to a vocational expert must be supported by some evidence in the record. *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 927-28 (6th Cir. 1987). A proper hypothetical question should accurately describe plaintiff "in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). *See also Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the evidence supports plaintiff's allegations of pain, a response to a hypothetical question that omits any consideration of plaintiff's pain and its effects is of "little if any evidentiary value." *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975). However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.*, 39 F.3d 115, 118 (6th Cir. 1994).

Pain alone, if the result of a medical impairment, may be severe enough to constitute disability. *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). In order to find plaintiff disabled on the basis of pain alone, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. If there is, the Commissioner must then determine: (1) whether the objective medical evidence confirms the severity of pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Duncan v. Secretary of H.H.S.*, 801 F.2d 847, 852-53 (6th Cir. 1986). *See also Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Jones v. Secretary of H.H.S.*, 945 F.2d 1365, 1369 (6th Cir. 1991). This test, however, "does not require . . . 'objective evidence of the pain itself.'" *Duncan*, 801 F.2d at 853. Where a complaint of pain is not fully supported by objective medical findings, the Commissioner should consider the frequency and duration of pain, as well as other precipitating factors including the effect of the pain upon plaintiff's activities, the effect

of plaintiff's medications and other treatments for pain, and the recorded observations of pain by plaintiff's physicians. *Felisky*, 35 F.3d at 1039-40.

Where the medical evidence is consistent, and supports plaintiff's complaints of the existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits. *King v. Heckler*, 742 F.2d 968, 975 (6th Cir. 1984). Where, however, the medical evidence conflicts, and there is substantial evidence supporting and opposing a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983) (per curiam). In either event, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to the factors listed above. *Felisky*, 35 F.3d at 1039-41.

In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Kirk*, 667 F.2d at 538. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985)(citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.,* 708 F.2d 1048, 1054 (6th Cir. 1983). A summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial. *Cornett v. Califano,* No. C-1-78-433 (S.D. Ohio Feb. 7, 1979) (LEXIS, Genfed library, Dist. file). A physician's statement that plaintiff is disabled is not determinative of the ultimate issue. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985). If not contradicted by any substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete

14

deference. *Harris,* 756 F.2d at 435. *See also Cohen v. Secretary of H.H.S.,* 964 F.2d 524, 528 (6th Cir. 1992). While the Commissioner may have expertise in some matters, this expertise cannot supplant the medical expert. *Hall v. Celebrezze,* 314 F.2d 686, 690 (6th Cir. 1963); Lachey v. Secretary of H.H.S., 508 F. Supp. 726, 730 (S.D. Ohio 1981).

It is the Commissioner's function to resolve conflicts in the medical evidence and to determine issues of credibility. *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987); *King v. Heckler,* 742 F.2d 968, 974 (6th Cir. 1984). The Commissioner's determination must stand if it is supported by substantial evidence regardless of whether the reviewing court would resolve the conflicts in the evidence differently. *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). *See also Boyle v. Sullivan,* 998 F.2d 342, 347 (6th Cir. 1993); *Tyra v. Secretary of H.H.S.,* 896 F.2d 1024, 1028 (6th Cir. 1990). The Commissioner must state not only the evidence considered which supports the conclusion but must also give some indication of the evidence rejected in order to facilitate meaningful judicial review. *Hurst v. Secretary of H.H.S.,* 753 F.2d 517, 519 (6th Cir. 1985). *See also Shelman v. Heckle*r, 821 F.2d 316, 321 (6th Cir. 1987).

Plaintiff may establish a prima facie case of disability by showing an inability to perform relevant previous employment. If plaintiff retains the residual functional capacity to perform the physical and mental requirements of work performed in the past, plaintiff is not disabled. 20 C.F.R. § 404.1520(e).

Plaintiff must prove an inability to return to his or her former type of work and not just to his or her particular former job. *Studaway v. Secretary of H.H.S.,* 815 F.2d 1074, 1076 (6th Cir. 1987) (citing *Villa v. Heckler,* 797 F.2d 794, 798 (9th Cir. 1986)); *see Jock v. Harris,* 651 F.2d 133, 135 (2d Cir. 1981). "Former type" of work means the general kind of work, i.e., janitorial work, that plaintiff used to perform. *Studaway,* 815 F.2d at 1076; *Jock,* 651 F.2d at 135.

"Work experience" is one of several vocational factors that may be considered when the issue of disability cannot be determined from the medical evidence alone. 20 C.F.R. § 404.1560(b). "Work experience" means skills and abilities plaintiff has acquired through previous work and which shows the type of work plaintiff is capable of performing. 20  C.F.R. § 404.1565(a). Work experience is relevant when it was performed within the last 15 years,

lasted long enough for plaintiff to learn to do it, and was substantial gainful activity. *Id.* If plaintiff has no work experience or has only worked "off-and-on" or for brief periods of time during the 15-year period, this activity will not generally be considered past relevant work. *Id.*

The duration of employment required to qualify as past relevant work varies according to the nature and complexity of the job. Past work has lasted long enough for plaintiff to learn it when there has been sufficient time to learn the techniques, to acquire information, and to reach the point where the job can easily be performed with average competency. SSR 82-62, 1982 C.E. 158.

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of

16

disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

Plaintiff's first Statement of Error is that the ALJ erred by failing to give controlling weight to the opinions of treating physicians, Steven Wunder, M.D. and Andrea Murphy, M.D. Plaintiff's argument in this respect is two-fold. First, he argues that the opinions of the two treating physicians should be given controlling weight because the opinions are well supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with other substantial evidence of record. As a secondary argument, Plaintiff asserts that if the reports of the treating physicians were not given controlling weight, those reports should have been given more weight than that afforded by the ALJ because the two physicians had a lengthy relationship with Plaintiff and that their opinions were supportable and consistent with Plaintiff's entire medical record. In addition, it was argued that Dr. Wunder, who is board certified in physical and rehabilitative medicine, is a specialist. Dr. Murphy's field is internal medicine. The reason for the secondary argument, it appears, is the fact that the observations of Drs. Wunder and Murphy are drawn from periods of time in 2005-2007, while the observations of Drs. Hill and Coffman, whose opinions were the basis for the hypothetical question to the VE, were made in 2004. Although the two sets of opinions are different, so are the time periods from which the observations were made. For a claimant whose physical condition is worsening, the two sets of opinions are not necessarily at odds.

In any event, what is undisputed is that Plaintiff had no significant health problems before the automobile accident in late November, 2002, and we also know that he worked as an IBEW electrician for twenty-one years before that date and was engaged in work described as heavy on the exertional scale. We know that Plaintiff attempted a return to work, but could not handle the job. We know that after trying physical therapy, medications and a series of epidural injections, Plaintiff decided to have two discs in his low back fused. We know that before undergoing surgery, Plaintiff was treated conservatively by Dr. Shockley, an orthopaedic surgeon and then by Dr. Stambough, a second orthopaedic surgeon, who actually performed the surgery. We know that following the surgery, Plaintiff participated in a lengthy program of therapeutic rehabilitation. We know that Plaintiff lost his employment because of he was physically unable

to perform the work. That he began to suffer from a lack of income from employment and became depressed over his inability to work should be of no surprise to anyone. We know that Dr. Stambough eventually referred his patient, first to Dr. Ruch for chiropractic manipulations, and then to Dr. Wunder, who specializes in rehabilitative medicine. Dr. Wunder thought that Plaintiff met the Listing for chronic radiculopathy and should be declared disabled. Dr. Murphy, Plaintiff's primary care physician, not only agreed, but considered her patient to be the most deserving of all the patients presently receiving disability payments.

The ALJ disagreed and found that Plaintiff could perform electrical work at a light exertional level. The decision that there were transferable skills was a no-brainer as was the ALJ's finding that Plaintiff could not return to his past relevant work as an electrician engaged in heavy work. Whether Plaintiff is able to perform the requirements of light or sedentary work is the issue. The ALJ noted that imaging of the skull and cervical spine within a month of the accident date showed no fracture or misalignment, but neural foraminal narrowing at C3-4. Imaging of the lumbar spine was negative. Imaging of the lumbar spine in January, 2003 showed left lateral disc protrusions at L3-4, L4-5 and L5-S1. An EMG in July, 2003 showed no evidence of radiculopathy. An additional MRI in August, 2003 showed degenerative disc disease at L3-4, L4-5 and L5-S1 without spinal stenosis or nerve root compression. A CT scan in August, 2003 showed minimal Grade I spondololisthesis at L4-5 with the bilateral L5 nerve roots being medially displaced within the thecal sac, mild disc bulging at the L5-S1 and L3-4 levels without spinal stenosis or nerve root compression, and mild degenerative facet disease at L5-S1. The surgery was performed in March, 2004 and postoperative x-rays showed proper stabilization and placement of screws. A follow-up visit to the surgeon in June, 2004 and post-operative x-rays showed the fusion to be progressing, but not solid.

Dr. Wunder status is problematic. Plaintiff was referred to Dr. Wunder by Dr. Stambough for diagnostic purposes and for resulting treatment. Although Dr. Wunder provided his thoughts for diagnostic purposes, the only treatment rendered was to prescribe Amitriptyline and Vicodin. Dr. Wunder saw Plaintiff three times, in May, June and December, 2005. Dr. Wunder took a history in which Plaintiff reported an exacerbation of symptoms, conducted a physical examination and reviewed the x-rays, MRIs and CT scan, and then gave his opinion.

18

Giving Plaintiff the benefit of the doubt that Dr. Wunder should be classified as a treating source, he did not have a lengthy treatment relationship with Plaintiff. On the other hand, Dr. Wunder is a specialist in rehabilitative medicine and the surgeon who did have a lengthy relationship with Plaintiff had only limited success in relieving Plaintiff's persistent low back pain. Thus, he sought advice from a colleague whose expertise is related to, but not coextensive with orthopaedics. Dr. Wunder's opinion was that Plaintiff met the Listing for chronic radiculopathy. Dr. Wunder did not identify the Listing, but he must have meant Listing 1.04(A), called "Disorders of the Spine," described as:

> herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture resulting in compromise of a nerve root or the spinal chord with evidence of nerve root compression, characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

Although Plaintiff did demonstrate that he has degenerative disc disease through the MRI in August, 2003, and the CT scan in August, 2003 did show a compromise of the nerve root, there is no direct evidence of nerve root compression as shown by the MRI in August, 2003 and the CT scan in August, 2003. However, nerve root compression can be identified indirectly or circumstantially by neuro-anatomic distribution of pain, limitation of motion of the spine, motor and accompanying sensory loss and positive straight-leg raising. Plaintiff did show a limited range of motion in the spine after surgery as Dr. Hill and Dr. Murphy explained. He also showed neuro-anatomic distribution of pain as that was the reason for the referral to Dr. Wunder. Dr. Wunder also found positive straight-leg raising and diminished strength and sensation in the left lower leg and foot during Plaintiff's examination in December, 2005.

The ALJ's explanation for disregarding Dr. Wunder's assessment was that it was "not consistent with the record as a whole." We don't understand that criticism. There is very little clinical data generated after the surgery in March, 2004. Post-operative x-rays only showed stabilization and the correct placement of screws. The Discharge Summary Report from the hospital showed that there were "no neurological complications." Dr. Stambough reported that

19

in June, 2004, about 3 months after the surgery, X-rays apparently taken than showed that the "fusion was progressing, although certainly not solid." The last contact between Plaintiff and Dr. Stambough took place in June, 2004, although Dr. Stambough did communicate in August, 2004 that following surgery, Plaintiff had lower back pain and a loss of lumbar motion.

A logical conclusion would be that, in the interim between June, 2004, when the treatment relationship between Dr. Stambough and Plaintiff apparently ended and his relationship with Drs. Murphy and Wunder began, his condition worsened. Thus his condition as reported by Dr. Stambough is not necessarily at odds with the findings made by Drs. Murphy and Wunder as the opinions relate to different time periods.

However, having said all that, the fact remains that Plaintiff has not appealed on the basis that the ALJ erred by failing to find that Plaintiff met Listing 1.04(A). Plaintiff has therefore waived that argument. Plaintiff has appealed on the basis that the ALJ should have found the reports of the two treating sources controlling. We disagree. Although Dr. Wunder is technically a treating source and although he is a specialist in physical medicine, his treatment relationship encompassed a short period of time, during which he rendered very little actual treatment. Dr. Wunder's real use was in providing an opinion which would assist Plaintiff in obtaining disability benefits. Dr. Murphy, whose field is internal medicine, has treated Plaintiff for a considerably longer period of time and on a more regular basis. Her examination of Plaintiff showed him to have an extremely limited range of motion of the spine in all directions. Her observation of Plaintiff was that he had an antalgic gait and needed a cane for support. Her opinion was that Plaintiff could not sit or stand for an extended period of time. Dr. Murphy is an internist with limited experience, and with great concern for her patients, but she is not a board certified orthopaedic surgeon.

We find that the opinions of the two treating physicians were not necessarily inconsistent with Plaintiff's medical record, but not supported by other evidence of record either. The ALJ decision to consider their views to be other than controlling was not erroneous under the facts and circumstances of this case.

The second Statement of Error, simply put, is that the ALJ erred in relying upon the VE's testimony. Since the VE's opinion is shaped by the assumptions related to him, an included

Statement of Error is that the assumptions themselves were erroneous. It is quite clear from a reading of the transcript that the residual functional capacity findings, proposed to the VE in the form of assumptions, were drawn from the opinions of Cindi Lynn Hill, M.D., a non-examining and non-treating physician and J. Rod Coffman, Ph.D., a non-examining and non-treating clinical psychologist. Dr. Hill's opinion was in October, 2004, approximately 6 months after Plaintiff's surgery, and it included a consideration of Dr. Stambough's report of June, 2004. She limited Plaintiff to occasional lifting of 30 lbs. and frequent lifting of 20 lbs., although she precluded repetitive lifting, as well as twisting or bending at the waist. Plaintiff, in her opinion, could sit and stand/walk for a total of 6 hours in a workday, but should have a sit/stand option. He could occasionally climb ramps or stairs, but should never crawl or climb ladders, ropes or scaffolds. Dr. Coffman diagnosed Plaintiff with Dythymic Disorder, the modern term for depression, but found no functional limitations of even a "moderate" degree of concern or seriousness.

In order to consider whether these limitations adequately described Plaintiff, we need to consider all professional views as they bear on the subject. Dr. Murphy said that "Plaintiff was unable to sit or stand for an extended period of time because of pain in his low back and legs, but she did not define what she meant by an "extended period of time." Dr. Wunder said that Plaintiff had "a permanent loss of residual functional capacities," a relatively meaningless statement unless it is coupled with a less global analysis, which Dr. Wunder did not provide. Dr. Hinzman's opinion, formulated two months after Plaintiff's surgery, was that he could lift 20 lbs. occasionally and 10 lbs. frequently, could stand/walk and sit for 6 hours in a workday, but should never climb ladders, ropes or scaffolds, but could occasionally crouch and stoop. Dr. Hinzman was a non-examining and non-treating physician. Dr. Stambough, at the point when he cleared Plaintiff to attempt a return to work, said that he should wear a back brace, have a sit/stand option, and never lift more than 30 lbs.

Light work is defined by Social Security regulations as involving the occasional lifting of 20 lbs. and the frequent lifting of up to 10 lbs. The ALJ asked the VE to assume that Plaintiff was able to perform light work, which assumption was a modification of Dr. Hill's opinion that Plaintiff could lift heavier weights. The weight limitation was in accord with Dr. Hinzman's opinion and was less than that of the treating surgeon, Dr. Stambough. The ALJ accepted the

walk/stand and sitting limitations of both Dr. Hill and Dr. Hinzman and further accepted the postural limitations of Dr. Hill, which were more restrictive than the postural limitations imposed by Dr. Hinzman. Neither Dr. Wunder nor Dr. Murphy completed a residual functional capacity analysis, and with respect to the conclusion made by Dr. Murphy that Plaintiff could not sit or stand for an extended period of time, the ALJ accepted the suggestion of Dr. Hill that a sit-stand option be imposed. We find that the ALJ did accommodate and accurately describe Plaintiff to the VE and committed no error in that respect.

We must next consider Plaintiff's shoulder impairments in connection with the residual functional capacity finding by the ALJ, who found Plaintiff to have a "shoulder impingement with underlying acromioclavicular joint arthrosis," a severe impairment. The shoulder impairment was described by Dr. Stambough as painful but without functional or range of motion limitations, as determined by examination and an MRI. The right shoulder was consistently worse than the left, so the ALJ accepted Dr. Hill's restriction that Plaintiff's use of the right shoulder was limited in all directions and that Plaintiff could elevate his right hand over his head only on occasion. In accepting the residual functional capacity assessment of Dr. Hill with respect to Plaintiff's right shoulder, the ALJ made no error. Although Dr. Wunder referred to Plaintiff's right shoulder as a rotator cuff tear and Dr. Murphy referred to it as a partial rotator cuff tear, Dr. Stambough, who read the MRI results, indicated that there was "no evidence of rotator cuff tear or disruption." It is therefore, more likely that Drs. Murphy and Wunder accepted Plaintiff's explanation for his shoulder impairment and that Plaintiff's understanding was somewhat flawed because Plaintiff testified that Dr. Stambough was considering rotator cuff surgery on both shoulders, support for which we cannot find in the record. We find, therefore, that the ALJ properly evaluated Plaintiff's shoulder impairment.

For the above reasons, the Court concludes that the ALJ's decision is supported by substantial evidence and should be affirmed.

## IT IS THEREFORE RECOMMENDED THAT

The decision of the Commissioner be AFFIRMED and this case be dismissed from the

22

docket of this Court.

December 5, 2008

Timothy S. Hogan
United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING THE FILING OF
## OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen (13) days (excluding intervening Saturdays, Sundays, and legal holidays) in the event this Report is served by mail, and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).